JUDGE NATHAN

Dale M. Cendali
Claudia Ray
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
dale.cendali@kirkland.com
claudia.ray@kirkland.com
*Attorneys for Plaintiff*

13 CV 3331

RECEIVED
MAY 17 2013
U.S.D.C. S.D.N.Y.
CASHIERS

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

---

**RAIN CORPORATION,**

　　　　**Plaintiff,**

　　v.

**JEFF PARRY, THOD INVESTMENTS d/b/a/
JEFF PARRY PROMOTIONS, ANNERIN
PRODUCTIONS, and NIRENNA
PRODUCTIONS LP,**

　　　　**Defendant.**

---

**COMPLAINT**

**JURY DEMAND**

　　　　Plaintiff Rain Corporation (hereinafter "Rain Corp."), by and through its

attorneys, Kirkland & Ellis LLP, for its Complaint against defendants Jeff Parry

("Parry"), Thod Investments d/b/a Jeff Parry Promotions ("JPP"), Annerin Productions

("Annerin") and Nirenna Productions ("Nirenna") (collectively, "Defendants"), hereby

states as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.     This case is about Defendants' willful attempt to appropriate for themselves the life's work of the members of The Beatles tribute band "Rain" by using Rain Corp.'s enormously successful original musical revue *Rain—A Tribute to The Beatles* ("*Rain-A Tribute*") to make a British version of the show, called *Let It Be*, which has already opened in London's West End and has announced plans to open on Broadway in New York in mid-2013.  Defendants have misappropriated plaintiff's copyrighted work without credit or compensation, have deprived them of artistic control over their show, and have been unjustly enriched by taking for themselves the benefit of Rain Corp.'s extensive work producing and creating *Rain-A Tribute* and *Let It Be*.

2.     As Defendants admit, Rain Corp. adapted *Let It Be* from its copyrighted work *Rain-A Tribute* by combining its existing copyrighted material, including the book for *Rain-A Tribute*, with, among other things, new artwork, set designs, and compilations and arrangements of songs that Rain Corp. created specifically for the London production in order to customize *Rain-A Tribute* for the London theater market.

3.     Promotional materials for *Let It Be* refer to it as the West End premier of *Rain-A Tribute*.  For example, Defendants' proposed marketing materials for *Let It Be* explain that "[h]aving been conceived in the U.S., RAIN has been reimagined for the West End with all new staging and U.K. specific video content. . . . Finally, on the 50th anniversary of the release of The Beatles first single Love Me Do, RAIN is looking to make the leap to London's West End."  In fact, the original website for *Let It Be* not only credits Rain as having created and conceived the show, but also acknowledges that the copyright belongs to Rain Corp.

4.     Press coverage likewise has made clear that *Let It Be* is a version of *Rain-A Tribute*. One article heralding *Let It Be* coming to the West End states that "[t]he show was originally called Rain but changed to LET IT BE for the London Run." Likewise, an early review of the show describes how

> "[t]he origins of Let It Be go back a long way. Its prehistory begins in 1975, when a group of Californian Beatles fans, led by Mark Lewis, got together to play covers for the door money in a San Fernando bar on Monday nights. They called themselves Rain. . . . By 2010 [Lewis] had put together a Beatles show of such caliber that it ran for 300 performances on Broadway. This is the enterprise that they have now brought to the West End."

5.     Pursuant to a September 10, 2009 agreement (the "September 10th Agreement"), Rain Corp. and Annerin were to have a "50/50% partnership," with Rain Corp. having sole artistic control over productions of *Rain-A Tribute*. Defendants, through defendant Jeff Parry, asserted that the September 10th Agreement would continue to govern the relationship between Rain Corp. and Annerin with respect to *Let It Be* even after its expiration, and that Defendants would in fact hold Rain Corp. responsible for half of any losses in the event that the London production was unsuccessful.

6.     Once the London production had successfully opened, however, Defendants, again through Parry, changed their tune, abruptly informing Rain Corp. that they would no longer be 50/50 partners with Annerin with respect to *Let It Be*. Instead, Rain Corp. would receive a far smaller share of the show's net profit, and would not share at all in the merchandising revenue or the creative royalty that it was to receive for the use of its book in *Let It Be*.

7.      Since *Let It Be* opened in September 2012, Defendants have failed to consult Rain Corp. as to any artistic decisions in connection with that or any other production of *Rain-A Tribute*, as they were contractually required to do, and have refused to provide Rain Corp. with its agreed-upon share of the revenue from those productions.

8.      Adding insult to injury, Defendants have in some instances removed Rain Corp.'s credit for the London version of the show from the production's marketing materials in an attempt to conceal its contributions to that production, while in other instances continuing to tout publicly the fact that *Let It Be* is a version of *Rain-A Tribute*, in order to trade off of the great success and popularity of Rain Corp.

9.      In addition to using Rain Corp.'s book and other copyrighted material from *Rain-A Tribute*, without authorization, for and in connection with *Let It Be*, Defendants also have infringed Rain Corp.'s registered copyrights in and to *Rain-A Tribute* by using its artwork in promotional materials for *Let It Be*, including for the upcoming production of *Let It Be* in Leipzig, which is explicitly advertised as a version of *Rain-A Tribute*, despite having eliminated Rain Corp.'s creative and production credit in the Program, and by using the audio segment of Rain Corp.'s CD recording of *Rain-A Tribute* to promote *Let It Be*, without any authorization or credit.

10.     Rain Corp. has spent countless hours working on *Let It Be*, including but not limited to training current cast members, creating and contributing to the creation of video and other artwork to be used during the show, overseeing and contributing to the creation of the set design and music (which includes original musical and vocal performances in the form of copyrighted keyboard samples that were created by and for Rain Corp. in connection with *Rain-A Tribute* and currently are used in *Let It Be*).

11.     In light of Defendants' willful, unauthorized use of Rain Corp.'s copyrighted work without compensation or credit, Rain Corp. has been forced to file this lawsuit as a result of Defendants' (1) infringement of Rain Corp.'s copyrighted works; (2) refusal to acknowledge Rain as a joint author of *Let It Be* and provide Rain Corp. an accounting, as required under the Copyright Act; (3) breach of the contractual agreement between Rain Corp. and Annerin under New York law, (d) unfair competition under New York law, and (e) unjust enrichment under New York law.

## PARTIES

12.     Rain Corp. is a Nevada corporation with its principal place of business at 2910 Poeville Lane, Reno, Nevada, 89523.  Rain Corp. is in the business of producing live entertainment events for the musical group "Rain" and of selling ancillary merchandise related to such events.

13.     Upon information and belief, Parry is a Canadian citizen residing in Calgary, Alberta, Canada.  Upon information and belief, Parry is a theatrical producer and the owner and/or chief executive of Defendants JPP, Annerin, and Nirenna.

14.     Upon information and belief, defendant JPP is a Canadian corporation with offices located at 304 8th Avenue SW, Calgary, Canada, T2P 1C2.  JPP is a theatrical production company.

15.     Upon information and belief, defendant Annerin is a Canadian corporation with offices located at #920-304 8th Avenue SW, Calgary, Alberta, Canada, T2P 1C2.  Upon information and belief, Annerin is a theatrical production company and a division of Thod.

5

16.     Upon information and belief, defendant Nirenna is a Nevada corporation with offices located at 7495 West Azure Drive, # 110, Las Vegas, NV 89130-4433. Nirenna is a theatrical production services company.

## JURISDICTION AND VENUE

17.     This action asserts claims arising under the Copyright Act, 17 U.S.C. § 101 et seq.. This Court has federal question jurisdiction over Rain's copyright claim pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1338(b). This Court also has subject matter jurisdiction over Rain Corp.'s state law claims pursuant to the principles of pendant jurisdiction under 28 U.S.C. § 1367(a).

18.     Upon information and belief, this Court has personal jurisdiction over Defendants because they transact business in New York. Upon information and belief, JPP, Jeff Parry, Annerin, and Nirenna each have engaged in a continuous and systematic course of doing business in New York, including in connection with (1) theatrical production activities, including the 2011 production of *Rain-A Tribute* on Broadway and their upcoming New York production of *Let It Be*, and (2) the negotiation and execution of numerous contractual agreements in New York, including a license agreement with New York-based Sony/ATV, which holds the rights to The Beatles catalog, and the agreements relating to *Let It Be*'s upcoming New York run. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

## FACTUAL BACKGROUND

### Rain Corp. and *Rain-A Tribute*

19.     Rain Corp.'s copyrighted work *Rain-A Tribute* tells the story of the history of The Beatles, using original dialog, artworks, video clips, set design, and costumes as

well as an original selection and arrangement of historical video footage and original Beatles songs selected to take the audience on a journey through the 1960s and early 1970s, and to convey the history and evolution of The Beatles.  At the heart of the show is a high-energy live performance of The Beatles' music that leaves the audience feeling as if it has attended an actual Beatles concert.

20.     *Rain-A Tribute* traces its origins to a club band known as "Reign" that performed Beatles songs as a regular part of its shows on the club circuit of Southern California in the 1970s.

21.     Over the years, the band changed its name to "Rain" and sought to be as true to the authentic Beatles experience as possible.

22.     In 2001, the Band's founding members—Mark Lewis ("Lewis"), Joey Curatolo ("Curatolo"), Ralph Castelli ("Castelli"), and Joe Bithorn ("Bithorn") (collectively, the "Band")—formed Rain Corp. to manage the various productions of *Rain-A Tribute*.  The Band's members are all employees of Rain Corp.

23.     Today, Rain Corp. is the highly successful producer of both *Rain-A Tribute* and *Yeah, Yeah, Yeah, a Tribute to The Beatles Starring Rain*.

24.     *Rain-A Tribute* has enjoyed enormous popularity, making it the highest-grossing show of its kind.  *Rain-A Tribute* has toured North America and Europe, playing hundreds of performances to more than one million people and grossing more than $85 million since 2008.

25.     In 2008, Pollstar ranked *Rain-A Tribute* number 17 on its "Pollstar's Hot Top 20" for overall tickets sales of a touring show, band, or production.

26.     On October 19, 2010, *Rain-A Tribute* opened on Broadway at the Neil Simon Theatre for a limited 12-week run, through January 15, 2011. The show recouped its entire investment in just seven weeks, and later moved to the Brooks Atkinson Theatre on February 8, 2011 for an extended run, which ended in July 2011.

27.     In addition to its commercial success, *Rain-A Tribute* also has enjoyed significant critical success, including winning the 2011 Broadway production won Drama Desk Award for Outstanding Revue.

28.     In reviewing the 2011 Broadway production, *The New York Times* noted that "[t]he audience is enraptured. They get a chance to sing along, twist and shout, and generally make like swooning teenyboppers from the 1960s as the hits roll by and the endorphins kick in." The *Los Angeles Times* has called *Rain-A Tribute* "impressive" and the *Toronto Star* called it "a fun-filled family crowd-pleaser." The *Boston Herald* said that "RAIN are a quartet of fine musicians in their own right. . . . As The Beatles, they triumph."

29.     In 2002, Rain Corp. recorded and released a CD of a live performance of *Rain-A Tribute*, entitled *Yeah, Yeah, Yeah, A Tribute to The Beatles Starring Rain.* In 2009, Rain Corp. recorded and released CDs of several live performances of *Rain-A Tribute*, including *Live 1*, *Live 2*, and *The Show That Never Was*, all of which bear copyright notices in the name of Rain Corp., as shown by the example below:



30.     Rain Corp. owns federal copyright registrations Nos. PAu3-654-096,

dated February 7, 2013, for *Rain-A Tribute*, and PAu2-848-746, dated August 8, 2008,

for *Yeah, Yeah, Yeah, a Tribute to The Beatles Starring Rain*.

31.     Rain Corp. also is the licensee of certain musical samples that were

created for use in *Rain-A Tribute*, and for which copyright registration, No. SRu1-115-

039, dated March 12, 2013, was issued in the name of Lewis, one of the Band's

members.

**The Parties' Contractual Agreements**

32.     In September 2005, JPP and Rain Corp. entered into a co-production

agreement, pursuant to which they were to "split all sources of income from the co-

production of the show 50/50%" and Rain Corp. was to have "artistic control."

33.     On or about September 10, 2009, Annerin and Rain Corp. entered into the September 10th Agreement, whereby they would engage in a "50/50% partnership" for the production of *Rain-A Tribute*, with the Band retaining full artistic control over the production.

34.     On September 22, 2009, Rain, Annerin and Nirenna entered into a Grand Rights License Agreement (the "Grand Rights Agreement") with Sony/ATV Music Publications, LLP ("Sony/ATV"), which is located in New York.  Pursuant to that agreement, Sony/ATV granted Rain, Annerin and Nirenna the right to use all of the John Lennon/Paul McCartney songs in its extensive catalog in connection with *Rain-A Tribute*, including on Broadway and in London's West End, whether under the name "Rain" or under another name.  As subsequently amended, the Grand Rights Agreement runs through August 2014.  *Rain-A Tribute* is one of only two Beatles tribute shows worldwide that hold "grand rights" licenses to the Sony/ATV catalog for use of the music in connection with a dramatic work.

35.     During the negotiations with Sony/ATV, Defendants and Rain Corp. repeatedly communicated with Sony/ATV in New York, including by telephone and in writing.  Defendant Parry and the Band's Mark Lewis ("Lewis") also met with Sony/ATV in New York in or about October 2009 in connection with the negotiation of the Grand Rights Agreement.

**The Broadway Production of *Rain-A Tribute***

36.     In 2011, Defendants and Rain Corp. produced the Broadway production of *Rain-A Tribute*.

37.     During that run, Defendants' executives, including Jeff Parry, frequently travelled to New York to view the show and meet with Rain Corp.'s members in connection with the production.

38.     Upon information and belief, the 2011 New York production of *Rain-A Tribute* generated significant revenue for Defendants.

### *Let It Be*

#### The Decision To Produce *Rain-A Tribute* In London

39.     In December 2011, defendant Parry informed Rain Corp. that he wanted to do a London production of *Rain-A Tribute*, and that he wanted Rain Corp.'s commitment that the Band's members would work on and contribute to that production, including securing a new British cast.  Parry also informed the Band that they had an opportunity to mount the show at the Prince of Wales Theatre, one of the best known theaters in London's West End theater district.  As shown below, the original conception for the show's advertising material made clear that it was to be *Rain-A Tribute*:



40.     In January 2012, following discussions with the owner of the Prince of Wales Theatre, and in order to enhance the show's appeal for a British audience, Rain Corp. agreed to change the name of the London production from *Rain-A Tribute* to a new name that would more readily evoke The Beatles in the minds of potential theater-goers and thus be more marketable to a British audience. After initially considering and rejecting a number of different names, including *Come Together* and *Love Me Do*, the decision was made to use *Let It Be* as the title for the new production.

41.     In or about February 2012, Rain Corp. and JPP began work on *Let It Be*.

42.     Pursuant to the September 10th Agreement, and taking into account the other royalty participants in *Let It Be*, Annerin and Rain Corp. were to split between them the "company share" of the proceeds from *Let It Be* (which included both ticket and merchandise revenue, and totaled 47.5% of the show's net revenue), as well as splitting a 5% creative royalty based on the show's gross revenue.

43.     In March 2012, advance ticket sales for *Let It Be* began. Upon information and belief, to date there have been sales of advance tickets for *Let It Be* through October 2013. As a co-producer of *Let It Be* with Annerin pursuant to the September 10th Agreement, Rain Corp. is entitled to share in the revenue generated by advance ticket sales.

44.     In or about April 2012, Parry demanded to know whether Rain Corp. would fully commit to *Let It Be*, asserting that the terms of the September 10th Agreement would continue to govern the parties' relationship with respect to that production, notwithstanding the fact that by its terms the agreement would end before the London production opened. Parry also told Rain Corp. that pursuant to the September

10th Agreement, Defendants would hold Rain Corp. responsible for its share of any losses, which would be recouped by taking 25% of the net touring profits from the North American tour of *Rain-A Tribute* over a three-year period.

45.     In response to Parry's demand, and in reliance on Parry's representation that the 50/50 partnership between Annerin and Rain Corp. applied to *Let It Be*, Rain Corp. confirmed its commitment to *Let It Be* as co-producer and creator.  Indeed, during the production period Band member and Rain Corp. co-owner Joey Curatolo even became the show's director.

46.     Upon information and belief, in or about April 2012 defendant Annerin formed Rain London Limited ("RLL") for the purpose of producing and presenting *Let It Be* in London.  Rain Corp. then sublicensed to RLL its rights under the Grand Rights Agreement to use The Beatles repertoire solely in the United Kingdom and Ireland, with the understanding that its "50/50% partnership" with Annerin was to govern the production of *Let it Be*.

47.     At the time that RLL was formed, Lewis expressed concern to Ralph Schmidtke ("Schmidtke"), an Annerin executive, about the fact that Rain Corp. was not a partner in RLL.  Schmidtke told Lewis that it was not necessary for Rain Corp. to be a formal partner in RLL as it would continue to participate in the revenue to be generated by *Let It Be* through its ongoing partnership with Annerin.

### The Band Works On Producing *Let It Be*

48.     During the production period for *Let It Be*, the Band's founder, Lewis, travelled to London twice to oversee auditions and cast the London production.  All creative decisions had to be cleared by the Band, which provided the book for *Let It Be*

and was responsible for the selection and sequencing of The Beatles songs to be included in the show, participated in the creation of the set design and costume design, and created much of the background video art used in the show, a significant portion of which was created in the United States.

49.     As part of the development of *Let It Be*, in July 2012 five cast members travelled to Reno, Nevada for one-on-one training by and rehearsals with the Band.  The purpose of that training, which lasted from July 23, 2012 to August 20, 2012, was to enable the cast to replicate *Rain-A Tribute* as performed by the Band in the United States, including in New York in 2011.  This training with the Band in the U.S. was a necessary predicate to launching the London production of *Let It Be*.

50.     During the Reno training sessions, the Band taught the *Let It Be* cast members everything they had developed in their thirty-plus years of experience, including the dialog used between musical numbers, the dialog used to encourage audience members to dance, the order of the songs, the musical cues, the placement of transitions, and the show's blocking, all of which is reflected in Rain Corp.'s copyrighted book for *Rain-A Tribute*.

51.     The Band also oversaw the cast's costume fitting and wig cutting/styling.

52.     Following two weeks of rehearsals and training, the *Let It Be* cast performed in a two-week long production of *Rain-A Tribute* in Montreal and Ottawa, Canada, which was intended to allow the cast to experience a full performance and to allow the Band to make any necessary changes to the production before it opened in London.

14

53.    After the August 2012 training sessions, Parry himself acknowledged to the Band how invaluable their work on the show was.  As Parry admitted, the Band's training in the United States was integral to the production of *Let It Be*.

54.    But Rain Corp.'s contribution to *Let It Be* did not end there.  The Band's members flew to London to oversee final rehearsals.  Keyboardist Mark Beyer set up all of the keyboard instruments and ensured all were working properly, in addition to providing his entire personal library of programs and samples, which he had created.  The Beyer-created programs and samples, which featured the actual performances of the Band's members, were loaded into the *Let It Be* keyboards for use during performances of the show.  Band member Bithorn provided all the guitar sounds that he had previously programmed for *Rain-A Tribute*, in order to ensure that all of the guitar sounds used during *Let It Be* perfectly emulated the guitar sounds of the original Beatles records.  The Band also worked on making set alterations, changing some of the commercials used as background art in the show, and improving the sound quality in the house.

### *Let It Be* Opens

55.    By its terms, the September 10th Agreement with Annerin expired on September 10, 2012.

56.    On September 14, 2012, the musical *Let It Be* opened at the Prince of Wales Theatre in London's West End for previews.

57.    *Let It Be* officially opened on September 24, 2012, to a packed house at the Prince of Wales Theater on the West End.  The audience loved it, and the show received a number of very positive reviews.

58.     Upon information and belief, *Let It Be* moved to the Savoy Theatre in London in or about February 2013, where it is scheduled to run until mid-October 2013. Upon information and belief, *Let It Be* has recouped its initial capitalization.


**Defendants Take Rain Corp.'s Work For Themselves**

59.     Within a few days following the successful London opening of *Let It Be*, apparently having gotten all that they needed from Rain Corp., Defendants abruptly changed their tune.

60.     Parry stated for the first time, in an e-mail to Rain Corp., that Defendants were no longer willing to renew their 50/50 partnership agreement with Rain Corp.  Parry also told Rain Corp. that rather than Annerin and Rain Corp. sharing equally in the "company share" of net revenue from *Let It Be* (*i.e.*, 47.5% of the show's net revenue, including merchandising revenue), Annerin instead would pay Rain Corp. 15% of the company share (*i.e.*, 15% of 47.5%, or 7.125%).  Parry also told Rain Corp. that it would not receive its one-half share of the gross creative royalty.

61.     *Let It Be* is a derivative work based on *Rain-A Tribute* that incorporates much of the book from *Rain-A Tribute*, as well as the video footage, artwork, and staging Rain Corp. created for *Rain-A Tribute*.

62.     Rain Corp. was directly involved in creating *Let It Be* as a derivative work based on its original musical *Rain-A Tribute*, including exercising final approval over all creative decisions.  Upon information and belief, any differences between the *Rain-A Tribute* and *Let It Be* directly resulted from creative decisions that were made or

authorized by Rain Corp. during the production period leading up to the September 24, 2012, opening of *Let It Be*.

63.     Upon information and belief, *Let It Be* as it is currently performed features 28 of the 31 Beatles songs selected by Rain for *Rain-A Tribute*, and the staging of many of the songs as well as the artwork used as background during the performance of many of those songs are similar or identical to that used in *Rain-A Tribute*.

64.     Upon information and belief, *Let It Be* employs the same acoustic versions of songs as does *Rain-A Tribute*.  Moreover, the same non-Beatles transition music and video, and identical or nearly identical footage of the Vietnam War and Woodstock, are used in both shows.  Upon information and belief, *Let It Be* uses copyrighted sound clips created for and/or by Rain Corp.

65.     When *Let It Be* first opened, Defendants properly credited Rain Corp. for its contributions to *Let It Be*.  For instance, in accordance with standard London theater practice, the show's original program stated that *Let It Be* was "created and conceived" by Rain Corp. and listed Band member Curatolo as the show's director and Rain Corp. as one of the producers.  Upon information and belief, Parry himself acknowledged that Rain Corp. created *Let It Be*, stating publicly that "Let It Be has been created by Rain Productions who previously transformed their Beatle's [sic] tribute act into a hugely successful Broadway and international production."  Indeed, Annerin's own website, <http://annerin.com/our-shows>, even states that "Let It Be is a media rich theatrical concert created by the global phenomenon RAIN."

66.     In addition, as shown below, the marketing materials for the current Leipzig production of *Let It Be*, which Rain Corp. did not approve and in which it did not

17

participate, acknowledge that the show is a version of the hugely successful *Rain-A Tribute*, which had previously been performed in Germany.



67.     Likewise, the media also have credited Rain Corp. as the creator of *Let It Be*.  For example, *Broadway Buzz* described the show as "produced in part by Rain Productions, whose *Rain: A Tribute to the Beatles* ran on Broadway in the fall of 2010."

68.     Defendants have continued to market and sell *Let It Be* merchandise that incorporates photographs of Band members performing in *Rain-A Tribute*, which they are offering through the show's official website, at <http://let-it-be-merchandise.myshopify.com/products/let-it-be-fridge-magnet>, and, upon information and belief, have sold to consumers in the United States, including in New York.

69.     Television ads for *Let It Be* continue to feature the soundtrack from *Rain-A Tribute*, including the musical and vocal performances of the Band's members. Audiovideo clips posted on the official Facebook page for *Let It Be* (which is accessible in the United States and, upon information and belief, runs off of Facebook's United

States-based servers), as well as television ads for *Let It Be* that are running in the United Kingdom, incorporate video footage of *Let It Be* with the cast, upon information and belief, lip-synching to audio recordings from the *Rain-A Tribute* CD that feature the Band's vocal and musical performances.

70.     Furthermore, upon information and belief, Defendants have continued to use the name *Rain-A Tribute* as well as the Band's likenesses in promoting *Let It Be* where it serves them to trade off Rain Corp.'s name and reputation, as shown below, while at the same time eliminating their credit for producing and creating the show, in an effort to conceal the nature and extent of Rain Corp.'s artistic contributions to *Let It Be*.



71.     Upon information and belief, despite exploiting and profiting off of Rain Corp.'s original and copyrighted material, Defendants have decided to take for themselves Rain's copyrighted materials without giving Rain Corp. any credit, paying it the contractually agreed upon share of the revenue from the show, or affording Rain

Corp. its contractually guaranteed artistic control.  Thus, among other things, Defendants have failed and refused to pay Rain Corp. its share of the ticket and merchandise revenue, and of the creative royalty, from *Let It Be*.

72.     Defendants' intent to deprive Rain Corp. of its reasonably-expected benefits under the September 10th Agreement is further evidenced by JPP's attempt to take *Let It Be* worldwide without including Rain in the venture and to capture international markets where Rain already had successful runs, including Leipzig, Cologne, Frankfurt, Japan, and South Africa.  For example, upon information and belief, Parry has stated to Brian Cohen of William Morris Entertainment that "I want to insure that you are 100% on our team and will not be booking Rain as this will be a conflict. We should tie up Japan soon to insure Rain does not try to enter the market."

73.     Indeed, Parry even flew to Japan, where Rain Corp. had previously produced a series of sold-out performances of *Rain-A Tribute*, while Rain was still performing there and while Defendants were receiving a share of the tour revenue, in order to persuade the Japanese promoter to book *Let It Be* in the future, instead of booking *Rain-A Tribute*.

**The Current Tour Of *Rain-A Tribute***

74.     Defendants and Rain Corp. are currently co-producing a United States tour of *Rain-A Tribute*.

75.     Although Defendants have refused to pay Rain Corp. anything in connection with *Let It Be*, they have asserted that Annerin and Nirenna are entitled to half of Rain Corp.'s revenue from the current tour of *Rain-A Tribute* in the United States because they are parties to the Grand Rights Agreement.

76.     Although Rain Corp. has received some partial payment in connection with the United States tour, Rain Corp. has not recouped its initial capitalization for the current United States tour.  Furthermore, Defendants recently informed Rain Corp. that they will withhold all of Rain Corp.'s income from the tour for April and May 2013, and will not provide Rain Corp. with any accounting, unless and until Rain Corp. (1) agrees to partner with them on productions of *Rain-A Tribute* through the remainder of the term of the Grand Rights Agreement from Sony/ATV, *i.e.*, August 2014, and (2) provides a written release of any claims that Rain Corp. may have against Annerin and Parry in connection with either the current United States tour of *Rain-A Tribute* or *Let It Be*.

**The Parties' Negotiations For A New Contract**

77.     Starting in August 2012, defendants, through Parry, have had ongoing discussions with Rain Corp. regarding the terms for a new co-production agreement that would apply to all productions of *Let It Be*.

78.     In their proposals to Rain Corp. during the course of those discussions, defendants repeatedly acknowledged Rain Corp.'s creative contribution to *Let It Be* and its right to compensation.

**Defendants' Plans to Bring *Let It Be* To New York**

79.     On May 8, 2013, Defendants announced that *Let It Be* would open on Broadway this summer at the St. James Theater, with previews scheduled to begin on July 16, 2013 and the opening planned for July 24, 2013.

80.     Defendants have taken affirmative steps to open *Let It Be* on Broadway in New York without consulting Rain Corp. or involving it in any way.  In their recent announcements regarding the forthcoming Broadway production, Defendants have

falsely described that production as having been developed as a West End production to celebrate The Beatles' 50th Anniversary, thus concealing Rain Corp.'s seminal role in the show's creation and development.

81.     Upon information and belief, Defendants have taken affirmative steps to launch the Broadway production of *Let It Be*, including but not limited to (1) soliciting investors in New York as part of their attempt to secure financing for the New York production, (2) booking the St. James Theater for that production, and (3) preparing to rehearse and/or rehearsing *Let It Be* in New York.

## COUNT ONE — COPYRIGHT INFRINGEMENT
### (17 U.S.C. § 101 et seq.)

82.     Rain Corp. incorporates by reference ¶¶ 1-81 above as if fully set forth herein.

83.     By the actions alleged above, Defendants have infringed and will continue to infringe Rain Corp.'s copyright in the Works by, among other things, publicly performing *Let It Be*, which is a derivative work based on *Rain-A Tribute*, in London, publicly performing the audio recording of *Rain-A Tribute* on the official *Let It Be* Facebook page, and taking steps to publicly perform *Let It Be* in New York, without Rain Corp.'s consent or authorization.

84.     Rain Corp. is entitled to recover from Defendants any actual damages it has sustained, and any gains, profits and advantages obtained by Defendants, as a result of their acts of infringement alleged above.  At present, the amount of such damages, gains, profits and advantages cannot be fully ascertained by Rain Corp., but will be established according to proof at trial.

85.     Rain Corp. also is entitled to recover statutory damages for Defendants' willful infringement of its copyright in the Works.

## COUNT TWO - DECLARATORY JUDGMENT
### (17 U.S.C. § 101 et seq.)

86.     Rain Corp. incorporates by reference ¶¶ 1-85 above as if fully set forth herein.

87.     Rain Corp. seeks a declaration that it is a co-author of *Let It Be* with Annerin because it has made independently copyrightable contributions to *Let It Be*.

88.     Rain Corp. and Annerin each intended at the time they created their respective contributions that they be merged into a single work, *i.e.*, *Let It Be*.

89.     As a joint author, Rain Corp. is entitled to an accounting and half of any proceeds obtained by Annerin as a result of its use of the joint work, *i.e.*, *Let It Be*.

## COUNT THREE – BREACH OF CONTRACT
### (New York Common Law)

90.     Rain Corp. incorporates by reference ¶¶ 1-89 above as if fully set forth herein.

91.     The September 10th Agreement was a valid contract between Rain Corp. and Annerin.

92.     An implied-in-fact agreement existed between Rain Corp. and Annerin with respect to the production of *Let It Be*, on the same terms as those set forth in the September 10th Agreement.

93.     Defendants, through Parry, represented to Rain Corp. that the terms of the September 10th Agreement would continue to govern the production of *Let It Be*, even

after the expiration of the September 10th Agreement.  Rain Corp. accepted and agreed to

that representation, which then formed the basis for Rain Corp.'s performance in

connection with *Let It Be*.

94.     Rain Corp. has complied with each and every one of its obligations under

both the September 10th Agreement and the implied-in-fact agreement between Rain

Corp. and Annerin, including but not limited to creating the derivative work *Let It Be*

based on its original copyrighted work *Rain-A Tribute* and training the cast of *Let It Be*.

95.     Annerin has breached Paragraphs 3-5 of the September 10th Agreement,

and the implied-in-fact agreement between it and Rain Corp., by, among other things, (1)

failing to pay Rain Corp. its one-half share of the ticket and merchandise revenue and

creative royalty from *Let It Be*, including but not limited to any and all monies generated

from advance ticket sales, (2) attempting to take advantage of business derived from Rain

Corp.'s efforts while excluding it from those ventures, and (3) depriving Rain Corp. of

artistic control of the show.

96.     The aforesaid acts have caused, and will continue to cause, significant

injury to Rain Corp.

97.     In addition, based on the aforesaid acts, Annerin has unlawfully and

wrongfully derived, and will continue to derive, income, profits and ever-increasing

goodwill from its activities at the expense, and to the detriment, of Rain Corp., which has

been, and will continue to be, damaged from Defendant's conduct in an amount to be

determined at trial.

## COUNT FOUR — UNFAIR COMPETITION
### (New York Common Law)

98.     Rain Corp. incorporates by reference ¶¶ 1-97 above as if fully set forth herein.

99.     The aforesaid acts of Defendants in producing *Let It Be* constitute unfair competition under the common law of New York in that Defendants knowingly and in bad faith duped Rain Corp. into spending its time, efforts, and creative energies on creating *Let It Be*, only to turn around and misappropriate its work and use it to compete unfairly with Rain Corp.'s own authorized productions of *Rain-A Tribute*.  In addition, Defendants have interfered with Rain Corp.'s ability to mount new productions, including in New York and other cities around the world, and will continue to do so.

100.    As a direct and proximate result of the foregoing acts, Defendants unlawfully derived and will continue to derive, income, profits and ever-increasing goodwill from its activities, and Rain Corp. has been damaged and has suffered and will continue to suffer significant damages, in an amount to be proved at trial.


## COUNT FIVE — UNJUST ENRICHMENT
### (New York Common Law)

101.    Rain Corp. incorporates by reference ¶¶ 1-100 above as if fully set forth herein.

102.    Defendants have taken advantage of the countless hours Rain Corp. has put into the development and production of the London run of *Let It Be*, including rehearsing and training the London cast.  As set forth above in detail, Rain Corp., through the Band and its other employees, has spent countless hours working on *Let It Be*,

including, among other things, training cast members, overseeing set and costume design, supervising costume fittings, selecting and sequencing songs, and ensuring optimal sound quality in the Prince of Wales Theater, all of which work has benefitted Defendants, without any compensation to Rain Corp., as a result of which Defendants have been unjustly enriched.

103.    As a direct and proximate result of the foregoing acts, Defendants have been and will continue to be enriched at the expense of Rain Corp., and Rain Corp. has been damaged and has suffered and will continue to suffer significant damages, including but not limited to the loss of its share of the revenue from the London production of *Let It Be*, in an amount to be proved at trial.

104.    Equity and good conscience require that Defendants be prevented from profiting from what they have unfairly taken.

## PRAYER FOR RELIEF

WHEREFORE, Rain requests:

(a)    That the Court find that Defendants have infringed Rain Corp.'s copyright in *Rain-A Tribute*;

(b)    That the Court find that Defendants have infringed Rain Corp.'s copyrighted material from *Rain-A Tribute* as incorporated in *Let It Be*;

(c)    That the Court find that Rain Corp. is a joint author of *Let It Be*;

(d)    That the Court enter judgment for Rain Corp. against Defendants for its actual damages according to proof, and for any profits

attributable to infringement of its intellectual property in accordance with proof;

(e)    That the Court enter judgment for Rain Corp. and against Defendants for statutory damages based upon their acts of infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, et seq.;

(f)    An award of Rain Corp.'s costs and disbursements of this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

(g)    That the Court award Rain Corp. its contractually-agreed one-half share of the revenue generated by the London production of *Let It Be*, and any other current or future productions of *Let It Be* in the United States and any other international markets; and

(h)    That the Court grants such other, further, and different relief as the Court deems just and proper.

Dated:  May 17, 2013

KIRKLAND & ELLIS LLP

*Dale Cendali*

Dale M. Cendali
Claudia Ray
601 Lexington Avenue
New York, New York 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
dale.cendali@kirkland.com
claudia.ray@kirkland.com

*Attorneys for Plaintiff*
RAIN CORP.